UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

IN RE:

GARY R. NELSON and                                        Chapter 7
CHARLENE NELSON

    Debtors.                                          Bankruptcy No. 04-01515S

GARY R. NELSON and
CHARLENE NELSON

    Plaintiffs

vs.                                                       Adversary No. 04-9104S

IOWA COLLEGE AID COMMISSION,
IOWA STUDENT LOAN LIQUIDITY CORP.

    Defendants.

EDUCATIONAL CREDIT MANAGEMENT CORP.

    Intervenor-Defendant.

<u>MEMORANDUM DECISION</u>

    Gary and Charlene Nelson ask the court to determine that their respective student loan obligations are dischargeable. Trial of this adversary proceeding was held May 4, 2005 in Sioux City. Wil L. Forker appeared as attorney for the Nelsons. Christopher Foy appeared as attorney for Educational Credit Management Corp. (hereinafter "Educational Credit"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). I have jurisdiction of this proceeding under 28 U.S.C. §§ 1334(b) and 157(a) and the District Court's order of reference.

    Gary R. and Charlene Nelson, husband and wife, filed their chapter 7 bankruptcy petition on April 20, 2004. Among their

scheduled debts Nelsons listed student loan obligations. The debts are owed to Educational Credit, and are insured by a governmental unit. Charlene owes two such debts, one in the approximate amount of $34,400.00 and the second in the approximate amount of $1,700.00. Gary owes one such debt in the approximate amount of $3,800.00. The validity and enforceability of the loans is not in dispute. Each of the loans is an educational loan within the meaning of 11 U.S.C. § 523(a)(8).

At the time of trial, Gary Nelson was 65 years old; Charlene was 57. Gary has a bachelor of arts degree in business administration which he received in 1965. For approximately 20 years he was employed as a social services worker for the State of Iowa and later as a probation/parole officer for the state. The evidence was contradictory as to whether he left the probation department voluntarily or was terminated. Gary testified that in the early 1980s he quit the job so that he could go into sales. Charlene testified in terms of her husband "losing" his job. She said she was not sure why he had lost his job, but that it may have had something to do with downsizing. Gary testified also that his leaving may have had something to do with downsizing. He said the job was not going well, but that he left voluntarily. After leaving the state's probation department, Gary had trouble finding work. He worked in sales a short time. He said that also did not work out. For at least two years he was unemployed. He obtained a series of short-term jobs. He worked at a Dairy Queen outlet and as a security guard for IBP, Inc.

2

Gary began taking social security retirement benefits at age 62. After retiring, he worked part time at placements obtained for him through the Senior Aides Division of the Community Action Agency of Siouxland. The Division apparently runs a program to obtain part-time work for seniors, but obtaining jobs appears to be conditioned on not exceeding a certain level of family income. Through the Division, Gary has worked at the Salvation Army and at the gift shop and research center for the Sioux City Museum. At the museum and the Salvation Army, one of his assignments was to answer telephone calls. He had difficulty with this responsibility because he has hearing problems. He has hearing aids but he does not like to wear them, as they "bother" him. Because of Charlene's income level, he was not able to obtain these part-time jobs after June 2004. He had been earning about $390.00 per month at these positions.

Gary has problems with his ankle which is deformed. He cannot stand for long periods of time or walk long distances. He buys a prescription drug for high blood pressure. He has dental problems and needs dentures. He now receives Medicare benefits. Charlene takes one prescription drug.

Gary does not have a driver's license. His driving privileges were revoked seven or eight years ago. He owes pending fines for driving without a license. The couple has one automobile which Charlene uses to travel to and from her job. The couple does not live near any public transportation routes. If Gary obtained a job, Charlene would have to drive him to and from work.

The couple owned a house for about 17 years. They lost the home in 1991 because of their financial difficulties. They rented after that for about 10 years. In 2000, they bought a two-year-old mobile home for approximately $24,000.00. It has a living room, two bedrooms, a kitchen and a bathroom. The Nelsons borrowed the money to buy the mobile home. They have a monthly loan payment of $344.57 for the 20-year term of the loan. The total cost of monthly housing also includes lot rental of $270.00, maintenance of $100.00, personal property taxes of $18.00, and gas and electric costs of $122.00. The total housing cost is $854.57.

When the Nelsons married, Charlene did not work outside the home. She decided to begin employment because of Gary's job difficulties. They were also hoping that her income would save the home which they later lost. In 1988 she enrolled at Briar Cliff College. She graduated in 1992 with a bachelor of arts degree in art, with education as a "supporting area." Her plan was to teach, but she never obtained a teaching certificate. After she graduated, she was offered a job as the director of the pre-school and day care center where she had worked part time while attending school. She worked there for 11 years, including nine and one-half years as director. Charlene lost her job there when the center closed in August 2001.

Shortly after the closing, she obtained a similar job at Angel House, a day care and pre-school center associated with Blessed Sacrament Church. Her beginning wage was $8.30 per hour. She now works 40 hours a week at two locations. She presently earns $8.40

4

per hour.

Charlene uses her art training to teach classes, as an independent contractor, at the Sioux City Art Center. Over the past four years she has averaged $1,200.00 in annual income from the teaching. Of late, the classes have fallen off in attendance, and Charlene does not anticipate that her income from teaching will increase.

The couple's federal tax returns for the past four years show the following income:

|  | Gary and Charlene Combined "Total Income" Before Taxes (Line 22) | Gary's Non-Taxable Social Security Income |
|---|---|---|
| 2001 | $28,395.00 | 0 |
| 2002 | 21,007.00 | 10,332.00 |
| 2003 | 22,657.00 | 10,476.00 |
| 2004 | 20,681.00 | 10,703.00 |

The couple's combined total income for 2002 included Charlene's wages and teaching income and Gary's unemployment compensation. Only Charlene had earned income after 2002. Gary's social security income is not included in the combined income figure. For 2004 their federal and state income taxes were $1,123.00. Tax refunds for 2004 totaled $306.00. This amount equals approximately $25.00 per month during the year. I assume this amount was not included in their interrogatory response as to their monthly income or in their Schedule I.

Monthly net income, at the time of filing, was shown on the debtors' Schedule I as $2,348.16 (Exhibit E). Debtors' response to an interrogatory showed expected monthly net income for 2005 to be

5

$2,369.05 (Exhibit F, interrogatory 22).  I will add $25.00 per month to account for tax refunds.  I find that debtors' net income per month is $2,394.00.

Debtors estimate their monthly expenses as follows:

| | |
|---|---:|
| Lot rent | $ 282.00 |
| Trailer payment | 344.57 |
| Home repairs | 100.00 |
| Electricity | 120.00 |
| Sewer/trash | 18.65 |
| Water | 10.13 |
| Telephone | 35.00 |
| Transportation | 100.00 |
| Groceries | 400.00 |
| Cable TV | 40.00 |
| Medical and dental | 125.00 |
| Clothing | 75.00 |
| Recreation | 100.00 |
| Insurances/taxes | 125.00 |
| Miscellaneous | 100.00 |
| Car loan payment | 271.92 |
| Total | $2,247.27 |

I have increased the lot rental figure by $4.67 per month to $282.00 to account for the variance mentioned by the debtors in their interrogatory answer.  The car loan is for a 1999 Pontiac Sunfire. It has 85,000 miles on it.  It will be paid off in 2006, but by then the car will be eight years old, so I do not expect that the debtors would be able to use the present amount of the car payment to pay toward the student loans.  It is likely that they will either have increased car maintenance expense or will have to make similar payments to obtain a replacement.

Charlene bought a computer about a year ago.  She paid approximately $500.00 for it.  She cannot operate it yet.  She recently signed up for internet access at a cost of $9.95 per month.

6

The couple has a dog.  Dog food costs about $11.00 per month.  I do not know if that is included in the grocery costs shown on Schedule I.

It appears that debtors' net income in excess of expenses would be $146.73 per month.  It is unlikely to be significantly greater for the foreseeable future.  It is likely that the couple's expenses will increase more annually than any increase in income.  They own no significant assets which might be disposed of.  Debtors do not believe they are able to further reduce their expenses.  However because I am required to consider the ability of debtors to sustain a "minimal" standard of living, I find the debtors could reduce expenses by $60.00 per month.  They include a line item of $40.00 for cable TV and $100.00 for recreational expense.  I assume the latter figure includes their having a pet and the internet service.  Recreation therefore actually totals $140.00.  This could be reduced and still provide some minimal choices.  The reduced monthly expense total would be $2,187.27.

As of August 16, 2004, Charlene owed $34,402.96 on one loan and $1,706.08 on the other.  Gary owed $3,794.06 on his student loan obligation.  His loan was incurred to aid his daughter in attending college.  She has now graduated, and she also has student loan debt. Nelsons estimate that over a 18-20 year period, they would have to pay at least $300.00 per month to pay off the loans.  By then, Charlene would be in her late seventies, and Gary would be in his eighties.

7

<u>Discussion</u>

Nelsons ask the court to determine that their student loan obligations are dischargeable because excepting them from discharge would impose an undue hardship on them.  11 U.S.C. § 523(a)(8).  The burden is on the Nelsons to prove the undue hardship exception.  <u>Long v. Educational Credit Management Corp.</u>, 271 B.R. 322, 328 (BAP 8th Cir. 2002), <u>rev'd on other grounds</u>, 322 F.3d 549 (8th Cir. 2003).

The court must examine the totality of the circumstances in determining whether excepting a student loan from discharge would impose an undue hardship.  In evaluating all the circumstances, the court must consider "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and [any] dependent's reasonably necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case."  <u>Long v. Educational Credit Management Corp.</u>, 322 F.3d at 554.  The analysis is performed on a loan-by-loan basis, not on the sum of all the loans.  <u>Andresen v. Nebraska Student Loan Program, Inc.</u>, 232 B.R. 127, 136-37 (BAP 8th Cir. 1999).

I first consider Gary's loan balance of $3,794.06, which for the purpose of analysis I will round off to $3,800.00.  I do not have sufficient evidence on the applicable interest rate or term of the loan to be able to calculate the monthly payment of his debt.  I will assume a 10-year term and an 8 per cent annual interest rate. I estimate his monthly payment to repay the loan under these terms as $46.10.

Next I consider Charlene's student loan debt of approximately $1,700.00. I will assume the same terms and estimate the monthly repayment amount to be $20.63.

I do not conclude that it would be an undue hardship on the debtors for the responsible debtor to repay his or her respective loan. The couple has a joint monthly disposable income of approximately $207.00 ($2,394.00 - $2,187.00). Based on debtors' ages, and their job and income histories, I do not consider that in the future they will earn substantially more money than they do now. It is likely that Gary could not earn any more than minimum wage at a part-time job. Defendant concedes that their expenses are reasonable. Their expenses are likely to increase over time, especially in the area of health costs. I expect that for the foreseeable future, and at least until Charlene retires, their disposable income will be approximately $207.00 per month. Repayment of the two smaller balance loans would require an estimated total payment of $67.00 per month. These two loans will not be excepted from the respective obligor's discharge. Repayment of the loans would leave monthly disposable income of approximately $140.00.

The balance of Charlene's remaining student loan is approximately $34,400.00. Assuming an eight per cent interest rate and a 20-year term, the monthly payment on the loan would be $287.74. If I assume a six per cent interest rate, the monthly payment would be $246.45. If I assume a four per cent interest rate, the monthly payment would be $208.46. I conclude that

9

Charlene would not be able to pay this loan without payment causing an undue hardship on her and her spouse. I conclude that Charlene's larger loan balance should not be excepted from discharge.

IT IS ORDERED that Gary Nelson's student loan obligation to Educational Credit Management Corp. is not excepted from his discharge, and his complaint against Educational Credit Management Corp. is dismissed.

IT IS FURTHER ORDERED that Charlene Nelson's smaller student loan obligation to Educational Credit Management Corp. is not excepted from her discharge.

IT IS FURTHER ORDERED that Charlene Nelson's larger student loan obligation to Educational Credit Management Corp. is dischargeable under the discharge which has entered in this case.

DATED & ENTERED: May 26, 2005

William L. Edmonds, Bankruptcy Judge

10